**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**PETER P.**

                              **Plaintiff,**

v.                                                                **5:19-CV-691 (NAM)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**[1]

                              **Defendant.**

---

**Appearances:**

Steven R. Dolson, Esq.
126 N. Salina St., Ste. 3B
Syracuse, NY 13202
*Attorney for the Plaintiff*

Ronald W. Makawa
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, MA 02203
*Attorney for the Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

    **I.    INTRODUCTION**

Plaintiff Peter P. filed this action on June 11, 2019 under 42 U.S.C. § 405(g), challenging the denial of his application for social security disability ("SSD") benefits and supplemental security income ("SSI") under the Social Security Act ("the Act"). (Dkt. No. 1). The parties'

---

[1] Plaintiff commenced this action against the "Commissioner of Social Security." (Dkt. No. 1). Andrew M. Saul became the Commissioner on June 17, 2019 and will be substituted as the named defendant in this action. Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to amend the caption.

briefs are now before the Court. (Dkt. Nos. 9, 14). After carefully reviewing the administrative record, ("R," Dkt. No. 8), the Court reverses the decision of the Commissioner and remands for further proceedings.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for SSD and SSI benefits on September 25, 2015. (R. 200–13). The initial claim was denied, and a hearing was then held on March 16, 2018 before Administrative Law Judge ("ALJ") Paul D. Barker. (R. 33–72). On August 31, 2018, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 7–23). Plaintiff's subsequent request for review by the Appeals Council was denied. (R. 1–4). Plaintiff then commenced this action. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff alleged that he became unable to work due to conditions including degenerative disc disease, herniated and/or bulging discs, meniscus tears and arthritis in both knees, depression, vision loss, vertigo, and a mild stroke. (R. 228).

Plaintiff was born in 1970 and last worked in 2013. (R. 37, 41). In December 1998, Plaintiff suffered a workplace accident when his legs were pinned between two cars; Plaintiff developed pain in the knees and back, and he had right knee surgery in 1999. (R. 373–81). After further treatment, Plaintiff returned to work, but he stopped in 2013 because his "body couldn't take the work anymore." (R. 41). Plaintiff testified that he has pain in the back, legs, knees, groin, and stomach, severe anxiety, high blood pressure, asthma, and blurry vision. (R. 42, 47). Plaintiff testified that he "can't lift his arm up," "can't lift anything," and "can't bend down." (R. 42). Plaintiff testified that he experiences intense throbbing pain in his knees while sitting. (R. 47–48). Plaintiff testified that he can walk or stand for about two minutes, and he

can sit for about 15 minutes before his foot falls asleep and he starts getting "really bad needles and stabbing like a knife in my back and going down my legs and everything else." (R. 52). Plaintiff testified that he gets anxiety every day and feels like a "nervous wreck." (R. 57, 60). Plaintiff testified that he uses a cane most of the time in order to get up and walk. (R. 58–59). Plaintiff spends most of the day lying in bed, watching television, and hanging out with his dog. (R. 48, 60).

### C. Medical Evidence

Since the parties have declined to do so, the Court will briefly summarize the relevant medical evidence in chronological order.

On December 14, 2015, Plaintiff was treated by Dr. Matthew Scuderi for his knee pain. (R. 424). On examination, Plaintiff's lower back was non-tender, straight leg tests were normal, he had full 5/5 strength in all motor groups, and intact reflexes in the knees. (R. 424). He was advised to undergo an MRI of the knees. (R. 424). On December 19, 2015, an MRI of the knees showed a tear of the medial meniscus, tendinosis of the proximal patellar tendon with nonspecific prepatellar edema/inflammation, and small knee joint effusion. (R. 338–40).

On January 4, 2016, Plaintiff returned to Dr. Scuderi and reported pain in the knees and back. (R. 365). Clinical findings remained the same. (R. 365). Dr. Scuderi found that Plaintiff's presentation was "consistent with mild varus alignment and medial compartment degenerative disease." (R. 366). His prognosis was fair, and he could "progress with activities as tolerated." (R. 366). Plaintiff was advised of treatment options including steroid injections. (R. 366).

On January 25, 2016, Plaintiff was treated by Dr. Mike Sun for evaluation of his lower back pain. (R. 421). Plaintiff's examination was mostly normal, but discomfort was noted with

paraspinal muscle palpation.  (R. 421).  He was advised to use Naproxen and undergo imaging of the lumbar spine.  (R. 421).  On January 27, 2016, an X-ray of Plaintiff's lumbar spine showed "[m]inor misalignment, with slight levoscoliosis and grade one retrolisthesis L5 on S1, mild exaggeration of normal lordotic curvature," and "[m]ild to moderate disc degeneration and hypertrophic facet disease."  (R. 433).  On February 8, 2016, an MRI of the lumbar spine showed a disc bulge at L4-L5 "with superimposed broad-based posterior disc herniation and mild to moderate bilateral neural foraminal narrowing, with slight impingement of the exiting L4 nerve roots, particularly on the right."  (R. 426).  Overall, the reported impression of the MRI was: "degenerative changes including a posterior disc herniation at L4-L5, without high-grade spinal canal stenosis or compression of the cauda equina."  (R. 427).

On March 25, 2016, Plaintiff was seen by a nurse practitioner at the New York Spine & Wellness Center.  (R. 440).  On examination, Plaintiff's lumbosacral spine was tender, range of motion was limited, and flexion and extension were painful and restricted.  (R. 442).  Plaintiff's knees were tender, range of motion was limited due to pain, and strength was normal.  (R. 442).  Plaintiff was assessed with chronic low back pain, lumbar disc herniation, lumbar facet arthropathy, and chronic knee pain.  (R. 442).  A nerve block injection was ordered to target Plaintiff's back pain and he was advised to follow up with an orthopedic surgeon for his knees.  (R. 443).  On March 28, 2016, Plaintiff received injections for his pain.  (R. 615).

On April 15, 2016, Plaintiff underwent an internal medicine examination with Dr. Elke Lorensen.  (R. 447–50).  Plaintiff reported pain in the back and knees and a history of asthma, hypertension, and mild stroke.  (R. 447).  His daily activities were noted as: "cooks daily, cleans, does laundry, shops once a month, showers, and dresses daily . . . watched TV, listens to the radio, and reads."  (R. 447).  On examination, Plaintiff appeared to be in no acute distress; his

4

gait was normal, he used no assistive devices, and he was able to get up without help. (R. 448). Dr. Lorensen found: cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally; no abnormality in thoracic spine; lumbar spine shows flexion to 50 degrees, extension 15 degrees, and lateral flexion 20 degrees bilaterally; forward elevation and abduction of the shoulders 100 degrees bilaterally; full range of motion of elbows, forearms, and wrists bilaterally; hip flexion 50 degrees bilaterally, knee flexion 75 degrees bilaterally, and full range of motion of ankles bilaterally; and his joints were stable and nontender. (R. 449). Further, Dr. Lorensen found full strength in the upper and lower extremities, and intact dexterity in the hands and fingers, with full grip strength. (R. 449). Dr. Lorensen diagnosed Plaintiff with back pain and bilateral knee pain, with a stable prognosis. (R. 449). Dr. Lorensen concluded that Plaintiff had: no gross limitations to sitting, standing, walking, handling small objects, and moderate limitations to bending, lifting, and reaching. (R. 449).

On July 13, 2016, Plaintiff saw Dr. Michael Rozell regarding his knee pain. (R. 629). Plaintiff reported that recent injections for his knees were unhelpful. (R. 629). On examination, Plaintiff's knees were tender, but functions remained mostly normal. (R. 629). Dr. Rozell noted that the MRI showed degenerative meniscal pathology in both knees. (R. 629). Dr. Rozell noted that Plaintiff's pain "clearly outweighs findings on exam and MRI." (R. 629). Dr. Rozell indicated that Plaintiff "has no specific restrictions from our point of view," and that his restrictions "are self-imposed based on his tolerance." (R. 629).

On February 13, 2017, Plaintiff received a nerve block injection to relieve his knee pain. (R. 515). On February 20, 2017, Plaintiff treated with Dr. Daniel DiChristina for his knee pain. (R. 458). Plaintiff's knee flexion and extension were limited from 2 to 3 out of 5. (R. 460). Plaintiff was assessed with tears of the medial meniscus of his knees. (R. 461). Dr. DiChristina

5

stated that surgery would not help Plaintiff's pain and he would have to modify his activity. (R. 461). On March 6, 2017, Plaintiff received another nerve block injection. (R. 509).

On April 5, 2017, Plaintiff saw Dr. Jacob Vella, a specialist in pain management at the New York Spine & Wellness Center. (R. 500). Plaintiff again reported pain in both knees. (R. 500). Plaintiff's active problems were noted as: chronic knee pain, chronic low back pain, lumbar disc herniation, lumbar face arthropathy, spondylosis of lumbosacral joint without myelopathy, tendinosis, and traumatic arthritis of both knees. (R. 501). Dr. Vella noted that Plaintiff's gait was antalgic, and flexion and extension were limited. (R. 502).

On April 14, 2017, Dr. Vella completed a form for Plaintiff's Workers' Compensation claim. (R. 535–37). Dr. Vella found that Plaintiff had marked impairment of both knees. (R. 536). Dr. Vella noted Plaintiff's history of a workplace injury in 1998 when his legs were crushed between two cars. (R. 536). As to physical findings, Dr. Vella described obvious swelling and diffuse tenderness in both knees, with limited knee flexion and extension, and strength of 4/5 to 5/5. (R. 536). Dr. Vella also noted recent MRI reports of Plaintiff's knees. (R. 536). Dr. Vella found that Plaintiff could only occasionally (one third of the time) sit, stand, walk, and perform various other basic activities such as lifting, pushing, pulling, and grasping. (R. 537). Based on these limitations, Dr. Vella concluded that Plaintiff was not capable of sedentary work. (R. 537).

On October 17, 2017, Plaintiff underwent an electrodiagnostic study of the bilateral lower extremities, which was normal. (R. 490). Plaintiff also had 5/5 strength in the lower limbs on examination. (R. 490). On November 29, 2017, Plaintiff saw Dr. Vella again and reported knee and back pain. (R. 481). Dr. Vella noted that Plaintiff was using a cane at the appointment, his gait was antalgic, and he could not get on/off the table without assistance. (R.

6

483).  Dr. Vella assessed Plaintiff with chronic lower back pain, chronic knee pain, and lumbar disc herniation.  (R. 483).

On November 17, 2017, Plaintiff saw another provider at the New York Spine and Wellness Center regarding his knee pain.  (R. 486–89).  Plaintiff was assessed with traumatic arthritis of both knees.  (R. 488).  Plaintiff was prescribed pain medication and advised "to use necessary assistive devices including [a] cane."  (R. 489).

### D.  ALJ Decision Denying Benefits

On August 31, 2018, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 7–23).  At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in gainful employment since December 31, 2013, the alleged onset date of disability.  (R. 13).

At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had the following "severe" impairments: degenerative disc disease of the lumbar spine, degenerative changes in the bilateral knees, and anxiety disorder.  (R. 13).  At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  (R. 13).

At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), 416.967(b), with the following additional limitations:

> The claimant is able to lift up to 20 pounds at a time, frequently lift or carry objects weighing up to 10 pounds, and stand, walk, and sit for approximately six hours each in an eight-hour workday; he can occasionally stoop, climb ramps and stairs, balance, kneel, crawl and crouch, and he can

7

> never climb ladders, ropes, and scaffolds; he cannot reach overhead; he can understand, remember, and carry out simple tasks and he can have few changes in the work setting.

(R. 15). The ALJ stated that this RFC finding was supported by Plaintiff's "clinical findings, treatment history, and reported activities of daily living, as well as the consultative examiner's opinion." (R. 20).

Next, the ALJ found that Plaintiff was unable to perform any past work. (R. 21). But after considering testimony from a vocational expert, the ALJ concluded that, based on Plaintiff's age, education, work experience, and RFC, Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. 22). Accordingly, the ALJ concluded that Plaintiff was not disabled under the Social Security Act. (R. 22).

### III. DISCUSSION

#### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the

> [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Regulations define residual functional capacity ("RFC") as "the most you can still do despite your limitations," including limitations on physical and mental abilities. 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the Commissioner considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'" *Id.* §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is affected by legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

### C. Analysis

Plaintiff contends that the ALJ committed reversible error in two ways: 1) by failing to properly follow the treating physician rule; and 2) by failing to account for the impact of a medically necessary handheld assistive device on Plaintiff's ability to perform work-related activities. (Dkt. No. 9).

#### 1) Treating Physician Rule

Plaintiff argues that the ALJ failed to properly follow the treating physician rule because he did not give controlling weight to the opinion of Dr. Vella or provide adequate reasons for discounting this opinion. (Dkt. No. 9, p. 7). In response, the Government contends that the ALJ properly afforded little weight to Dr. Vella's opinion. (Dkt. No. 14, p. 4).

There is no dispute that Dr. Vella was Plaintiff's treating physician and saw Plaintiff several times for pain management. Dr. Vella opined the Plaintiff had marked impairment of the knees, significant restrictions to sitting, standing and walking, and he was limited to less than the full range of sedentary work. (R. 537). The ALJ gave this opinion "little weight" because Dr.

Vella's assessment "is wholly inconsistent with the overall evidence of record." (R. 18). Specifically, the ALJ cited evidence that: 1) Plaintiff engaged in a conservative course of treatment and the abnormal physical examinations findings have been minimal; 2) the frequent documentation that the Plaintiff had full muscle strength in all tested areas and only slight crepitus in his right knee; and 3) radiological testing document only degenerative changes in the Plaintiff's lumbar spine and no acute or significant chronic pathology in his knees. (R. 18).

However, this analysis falls short of the specific procedures ALJ's must follow in determining the appropriate weight to assign a treating physician's opinion, which was recently articulated by the Second Circuit as follows:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, [the ALJ] must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

*Estrella v. Berryhill*, 925 F.3d 90, 95–98 (2d Cir. 2019). The Circuit also noted that "[a]n ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id.* (citing *Selian*, 708 F.3d at 419–20). If the Commissioner has not

11

otherwise provided "good reasons" for its weight assignment, then the error is not harmless, and remand is necessary for the Commissioner to "comprehensively set forth [its] reasons." *Id.* (citing *Halloran*, 362 F.3d at 32–33).

In this case, the ALJ failed to sufficiently explain why Dr. Vella's opinion was not entitled to controlling weight. Although the ALJ mentioned the inconsistency of the opinion with the overall record, the decision does not address the frequency, length, nature, and extent of Plaintiff's treatment with Dr. Vella, the amount of medical evidence supporting the opinion, or whether Dr. Vella was a specialist. *See* 20 C.F.R. § 404.1527(c)(2). Indeed, Dr. Vella specializes in pain management, he saw Plaintiff several times in 2017, and Plaintiff was a frequent patient at his practice, the New York Spine & Wellness Center.

Therefore, the ALJ erred in analyzing the Dr. Vella's treating physician opinion. And the Court cannot conclude the error was harmless because the ALJ's analysis does not otherwise provide good reasons for the weight given to Dr. Vella's opinion. Indeed, the reasons cited by the ALJ are not fully consistent with the record. For example, the ALJ's characterization of the radiological testing does not appear to account for MRI findings of a herniated disc in Plaintiff's back or meniscal tears in his knees. (R. 338–40, 426–27). Further, the fact that Plaintiff engaged in a conservative course of treatment is not a sound reason for discounting a treating physician's opinion. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Nor is the opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen."); *Nusraty v. Colvin*, 213 F. Supp. 3d 425, 440 (E.D.N.Y. 2016) ("The ALJ's reliance on her conclusion that Dr. Blacher's treatment of Plaintiff was conservative was not a proper basis to discount Dr. Blacher's opinion about Plaintiff's capacities and limitations.").

12

Accordingly, remand is necessary for the ALJ to reconsider Dr. Vella's opinion and provide detailed reasons for the weight given, recognizing his status as a treating physician.[2] The ALJ may also wish to further develop the record and ask Dr. Vella for a more rigorous evaluation of Plaintiff's functional limitations. *See Estrella*, 925 F.3d at 95–96; *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) ("[B]ecause . . . the ALJ . . . failed to follow SSA regulations requiring a statement of valid reasons for not crediting the opinion of plaintiff's treating physician, . . . a remand is necessary in order to allow the ALJ to reweigh the evidence."); *see also Kuhaneck v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 241, 245–48 (W.D.N.Y. 2019) (remanding for further proceedings where the ALJ rejected a detailed medical source statement from the plaintiff's treating physicians without providing sufficiently good, nonconclusory reasons for rejecting it); *Nusraty*, 213 F. Supp. 3d at 442 (remanding for further proceedings where the ALJ rejected the treating physician's opinion that the plaintiff had difficulty standing, sitting, and walking for extended periods, without first developing the record by following up with the treating physician to request supporting documentation or to obtain additional explanations for his findings).

IV. **CONCLUSION**

For the foregoing reasons it is

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

---

[2] Because remand is necessary, the Court declines to address Plaintiff's additional argument regarding the ALJ's failure to account for Plaintiff's use of an assistive device. *See Insalaco v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 401, 410 (W.D.N.Y. 2018) (declining to reach the plaintiff's additional arguments after remanding for further administrative proceedings where the ALJ failed to properly apply the treating physician rule).

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties in accord with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   May 27, 2020
          Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge